1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE LAUREN KING

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WASHINGTON STATE MEDICAL
ASSOCIATION; WASHINGTON STATE
NURSES ASSOCIATION; WASHINGTON
CHAPTER OF THE AMERICAN ACADEMY
OF PEDIATRICS; ACADEMYHEALTH;
ASSOCIATION OF NURSES IN AIDS CARE;
FAST-TRACK CITIES INSTITUTE;
INTERNATIONAL ASSOCIATION OF
PROVIDERS OF AIDS CARE; NATIONAL
LGBT CANCER NETWORK; VERMONT
MEDICAL SOCIETY,

        *Plaintiffs*,

    v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services; DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DIRECTOR OF THE
CENTERS FOR DISEASE CONTROL AND
PREVENTION; CENTERS FOR DISEASE
CONTROL AND PREVENTION; JAY
BHATTACHARYA, in his official capacity as
Director of the National Institutes of Health;
NATIONAL INSTITUTES OF HEALTH;
MARTIN A. MAKARY, in his official capacity
as Commissioner of Food and Drugs; FOOD
AND DRUG ADMINISTRATION; THOMAS J.
ENGELS, in his official capacity as
Administrator of the Health Resources and
Services Administration; HEALTH

Case No. 2:25-cv-00955-LK

**FIRST SUPPLEMENTAL
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  RESOURCES AND SERVICES
2  ADMINISTRATION; CHARLES EZELL, in his
   official capacity as Acting Director of the Office
3  of Personnel Management; OFFICE OF
   PERSONNEL MANAGEMENT,
4
5              *Defendants.*

6                    **INTRODUCTION**

7         1.      This action challenges the widespread deletion of public health resources from

8  federal websites. Dozens (if not more) of taxpayer-funded webpages, databases, and other crucial

9  resources have vanished since January 20, 2025, leaving doctors, nurses, researchers, and the

10 public scrambling for information. These actions have undermined a longstanding, congressionally

11 mandated regime; irreparably harmed Plaintiffs and others who rely on these federal resources;

12 and put the nation's public health infrastructure in unnecessary jeopardy.

13        2.      The removal of public health resources was apparently prompted by two recent

14 executive orders—one focused on "gender ideology" and the other targeting diversity, equity, and

15 inclusion ("DEI") programs. Defendants implemented these executive orders in a haphazard

16 manner that resulted in the deletion (advertent or otherwise) of health-related websites and

17 databases, including information related to pregnancy risks, public health datasets, information

18 about opioid-use disorder, and many other valuable resources.

19        3.      The unannounced and unprecedented deletion of these federal webpages and

20 datasets came as a shock to the medical and scientific communities, which had come to rely on

21 them to monitor and respond to disease outbreaks, assist physicians and other clinicians in daily

22 care, and inform the public about a wide range of healthcare issues. Health professionals, nonprofit

23 organizations, and state and local authorities used the websites and datasets daily to care for their

24 patients, provide resources to their communities, and promote public health.

25        4.      The sudden deletions set off a race to download and preserve as many vital datasets

26 and as much critical information as possible. Major research institutions, nonprofits, archivists,

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 2
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   and grassroots teams of volunteers scoured the internet for the deleted data, often coming up empty

2   handed. Ultimately, the effort to preserve the purged data was just marginally successful: Only

3   large institutions with significant resources can host such massive datasets, and some datasets

4   disappeared completely before they could be archived. And though some research advising doctors

5   and patients about medical conditions and procedures is currently accessible via third-party

6   internet archival websites, that information is static.

7       5.    Today, thousands of databases remain deleted, depriving medical and scientific

8   professionals, researchers, and the public of critical resources. And while Defendants have

9   reuploaded a handful of datasets and websites—some in response to court orders—those efforts

10  have been inconsistent and scattershot.[1]

11      6.    Every day, doctors, nurses, researchers, and other public health professionals try to

12  access resources that they have used regularly or previously relied on, only to find that the

13  resources remain offline. The deletion of these resources has impeded the abilities of clinicians to

14  care for their patients, of researchers to advance groundbreaking medical breakthroughs, of public

15  health officials to track emerging disease outbreaks, and of members of the public to learn more

16  about their health. The result has been irreparable harm throughout the medical establishment and

17  across the country.

18      7.    Over many decades, Congress crafted a statutory regime requiring the Department

19  of Health and Human Services ("HHS") and its constituent agencies to not only investigate various

20  issues related to the nation's public health but also make these findings and resources available to

21  researchers, practitioners, and the public at large. Simply put, Defendants cannot disregard these

22  legislative mandates in response to executive orders; Congress, not the executive branch, gets to

23  decide whether these statutory directives remain in effect.

24

25

26
    _____
    [1] A list of affected resources, including the status of each as of July 25, 2025, is included
    as Appendix A.

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 3
(No. 2:25-cv-00955-LK)

8.      Plaintiffs therefore bring this lawsuit to challenge Defendants' unlawful removal of public health webpages and datasets. Both the U.S. Constitution and the Administrative Procedure Act ("APA") require Defendants to follow and faithfully administer congressional enactments. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (executive branch cannot "enact, [] amend, or [] repeal statutes"); 5 U.S.C. § 706(2)(A) (empowering reviewing court to "hold unlawful and set aside agency action" that is "found to be . . . not in accordance with law"). Multiple federal statutes require HHS and its constituent agencies to make available research and resources related to a range of public health issues. Defendants' removal of public health webpages violates these congressional mandates and must be set aside.

9.      Moreover, the APA requires that agency action follow certain bedrock procedural requirements and forecloses action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Defendants have failed to provide required notice of their actions and implemented the relevant executive orders in an arbitrary, capricious, and unreasoned manner. These actions further violate federal law and must be enjoined.[2]

---

[2] A nonprofit medical organization called Doctors for America ("DFA") and the City and County of San Francisco are currently challenging the removal of a subset of these public health webpages and resources in the U.S. District Court for the District of Columbia. On February 11, 2025, that court issued a temporary restraining order after concluding that DFA was likely to succeed on the merits of its APA claims. *See Drs. for Am. v. OPM*, 766 F.Supp.3d 39, 49–53, 56–57 (2025). Among other emergency relief, the court ordered HHS, the Centers for Disease Control and Prevention, and the Food and Drug Administration to "restore to their versions as of January 30, 2025, each webpage and dataset identified by" DFA in its motion, *id.* at 56—only some of which are resources Plaintiffs address here, *see* App. A. A joint status report filed by the parties two days later indicated that "Defendants will restore the resources [identified by DFA] by the end of the day on February 14, 2025." Joint Status Report at 1, *Drs. for Am. v. OPM*, No. 25-322 (JDB) (D.D.C. Feb. 13, 2025), Dkt. No. 13. The court allowed the temporary restraining order to expire on February 25 "on the basis of the defendants' representations that they will maintain the relevant webpages after the expiration of the TRO and will only modify or remove relevant webpages in accordance with applicable laws." Order at 2–3, *Drs. for Am. v. OPM*, No. 25-322 (JDB) (D.D.C. Feb. 24, 2025), Dkt. No. 26. On July 3, the court "grant[ed] in part the plaintiffs' motion for summary judgment, vacat[ing] the OPM Memo and the HHS Guidance" that prompted the website removals "and order[ing] the restoration of *some* webpages and datasets." *Drs. for Am. v. OPM*, No. 25-322 (JDB), 2025 WL 1836009, at *24 (D.D.C. July 3, 2025) (emphasis added). The ordered

---

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 4
(No. 2:25-cv-00955-LK)

1

**PARTIES**

2       10.     Plaintiff Washington State Medical Association ("WSMA") is a private, nonprofit

3   membership organization and the largest physician professional association in Washington State,

4   representing physicians, residents, medical students, and physician assistants from nearly all

5   specialties and practice settings throughout the state.[3] WSMA focuses on providing strong

6   physician leadership and advocacy to shape the future of medicine and advance quality healthcare

7   for all Washingtonians. WSMA and its members use federal medical research, data, and other

8   resources, including the now-deleted webpages and databases, to advise patients daily. WSMA

9   members, their patients, and their patients' families have suffered and will continue to suffer harm

10  because of the deletion of many of these resources.

11      11.     Plaintiff Washington State Nurses Association ("WSNA") is a professional

12  organization and labor union representing more than 20,000 registered nurses in Washington

13  State.[4] It is the Washington constituent of the American Nurses Association and an affiliate of the

14  American Federation of Teachers, a national union representing professionals in education,

15  healthcare, and public service. WSNA is dedicated to advancing and advocating for nurses and the

16  nursing profession in Washington. It provides leadership for the nursing profession and promotes

17  quality healthcare for consumers through education, collective bargaining, and policy advocacy.

18  WSNA and its members are on the front line of providing healthcare services, including preventive

19  care. Members use federal medical research, data, and other resources, including the now-deleted

20

21  ───────────────

22  relief was limited to "restoring the webpages and datasets *on which the plaintiffs rely* and that the
    defendants either removed or substantially modified pursuant to the OPM Memo or HHS
23  Guidance." *Id.* at \*23 (emphasis added). The court did *not* "require the HHS defendants to undo
    *every* action taken pursuant to the OPM Memo or HHS Guidance." *Id.*; *see also* App. A
24  (identifying which websites were addressed in *Doctors for America* and reporting current status of
    each).

25      [3] *About Us*, WSMA, https://wsma.org/WSMA/About/About_Us.aspx (last visited May 19,
    2025).

26      [4] *About WSNA*, WSNA, https://www.wsna.org/about (last visited May 19, 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 5
(No. 2:25-cv-00955-LK)

1    webpages and databases. WSNA members, their patients, and their patients' families have suffered

2    and will continue to suffer harm because of the deletion of many of these resources.

3           12.    Plaintiff Washington Chapter of the American Academy of Pediatrics ("WCAAP")

4    is a 501(c)(3) nonprofit organization that represents over 1,200 pediatric healthcare providers—

5    including general pediatricians, sub-specialists, hospitalists, family physicians, and advanced

6    practice providers—in Washington State.[5] WCAAP seeks to champion the health and well-being

7    of children, adolescents, and families through advocacy, education, and partnership. It and its

8    members rely on federal medical research, data, and other resources, including the now-deleted

9    webpages and databases, to advise patients. WCAAP members, their patients, and their patients'

10   families have suffered and will continue to suffer harm because of the deletion of many of these

11   resources.

12          13.    Plaintiff AcademyHealth is a 501(c)(3) nonprofit professional society dedicated to

13   the field of health-services research and promoting the interests of its members.[6] AcademyHealth

14   is an objective broker of information, bringing together stakeholders to address the current and

15   future needs of an evolving health system, inform health policy and practice, and translate evidence

16   into action. AcademyHealth is a trusted partner in the discovery and dissemination of timely and

17   relevant research-based strategies to improve health and healthcare. AcademyHealth and its

18   members rely extensively on federal medical research, data, and other resources, including many

19   of the now-deleted webpages and databases, and have suffered and will continue to suffer harm

20   because of the deletion of many of these resources.

21          14.    Plaintiff Association of Nurses in AIDS Care ("ANAC") is the leading nursing

22   organization responding to HIV/AIDS and, since its founding in 1987, has been meeting the needs

23

24

25          [5] *About WCAAP*, WCAAP, https://wcaap.org/about (last visited May 19, 2025).

26          [6] *About AcademyHealth*, AcademyHealth, https://academyhealth.org/about (last visited May 19, 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 6
(No. 2:25-cv-00955-LK)

of nurses and other healthcare professionals in HIV/AIDS care, research, prevention, and policy.[7] ANAC aims to promote the health and welfare of people affected by HIV/AIDS by creating an effective, engaged network of nurses in AIDS care; studying, researching, and exchanging information, experiences, and ideas leading to improved care and prevention; providing leadership to the nursing community in matters related to HIV/AIDS infection and its comorbidities; advocating for effective public policies and quality care for people living with HIV; and promoting social awareness concerning issues related to HIV/AIDS. ANAC is a professional membership association comprising thirty-eight chapters across the United States, representing a dedicated group of nurses, healthcare professionals, and others who are committed to HIV/AIDS nursing. These affiliate members include social workers, pharmacists, physician assistants, lawyers, and doctors. ANAC and its affiliates rely on federal medical research, data, and other resources, including the now-deleted webpages and databases, to advance their mission of treating, studying, and promoting awareness of HIV/AIDS. ANAC and its affiliates have suffered and will continue to suffer harm because of the deletion of many of these resources.

15.    Plaintiff Fast-Track Cities Institute ("FTCI") is a 501(c)(3) nonprofit organization that seeks to support cities and municipalities worldwide to accelerate their responses to HIV, tuberculosis, viral hepatitis, and other health conditions in support of healthy, equitable, and resilient communities.[8] FTCI supports the more than 550 cities and municipalities in the Fast-Track Cities network, which includes 50 cities and counties across the United States and the Commonwealth of Puerto Rico. FTCI provides technical assistance to its constituent municipalities by conducting qualitative research, implementation planning, and data generation, monitoring, and analysis. FTCI relies extensively on federal medical research, data, and other resources, including many of the now-deleted webpages and databases, in providing this technical

---

[7] *What Is the Association of Nurses in AIDS Care?*, ANAC, https://www.nursesinaidscare.org/i4a/pages/index.cfm?pageid=3277 (last visited May 19, 2025).

[8] *Fast-Track Cities Institute*, FTCI, https://www.ftcinstitute.org/#about (last visited May 19, 2025).

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    assistance—particularly in the use of disaggregated data to guide city and county program design,

2    implementation, and monitoring. FTCI and its affiliates have suffered and will continue to suffer

3    harm because of the deletion of many of these resources.

4        16.    Plaintiff International Association of Providers of AIDS Care ("IAPAC") is a

5    501(c)(3) nonprofit organization that seeks to improve access to and the quality of prevention,

6    care, treatment, and support services delivered to people living with and affected by HIV and

7    related comorbid diseases.[9] IAPAC represents more than 30,000 clinicians and allied health

8    providers worldwide who deliver services to treat diseases such as HIV, hepatitis, and tuberculosis,

9    as well as mental health conditions, substance-use disorders, and concomitant diseases, including

10   Mpox. In the United States, its territories, and the Commonwealth of Puerto Rico, IAPAC works

11   with a wide range of academic institutions, clinical practices, community health centers,

12   government health agencies, private communities, and community- and faith-based organizations

13   to advance educational, research, technical-assistance, and advocacy programming led by IAPAC

14   members. IAPAC and its members rely extensively on federal medical research, data, and other

15   resources, including many of the now-deleted webpages and databases, to deliver evidence-based,

16   person-centered, integrated prevention, care, treatment, and psychosocial support services. IAPAC

17   and its members have suffered and will continue to suffer harm because of the deletion of many

18   of these resources.

19       17.    Plaintiff National LGBT Cancer Network (the "Network") is a 501(c)(3) nonprofit

20   organization that works to improve the lives of LGBT cancer survivors and those at risk by

21   educating the LGBT community about their increased cancer risks and the importance of screening

22   and early detection; training healthcare providers to offer more culturally competent, safe, and

23   welcoming care; and advocating for LGBT survivors in mainstream cancer organizations, the

24

25

26   _____

     [9] *About the International Association of Providers of AIDS Care (IAPAC)*, IAPAC, https://www.iapac.org/about (last visited May 19, 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 8
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

media, and research.[10] The Network and its affiliates rely on federal medical research, data, and other resources, including the now-deleted webpages and databases, to educate the LGBT community and train healthcare providers. The Network and its affiliates have suffered and will continue to suffer because of the deletion of many of these resources.

18.     Plaintiff Vermont Medical Society ("VMS") is a nonprofit professional organization with 2,600 physician, physician assistant, and medical student members across specialty and practice locations.[11] VMS is dedicated to protecting the health of all Vermonters and improving the environment in which Vermont physicians and physician assistants practice medicine. To achieve this mission, VMS advocates for medical professionals in the state capital, acts as a bridge between members and policymakers, and organizes educational and social programs. VMS and its members rely on federal medical research, data, and other resources, including the now-deleted webpages and databases, to advise and educate patients daily. VMS members, their patients, and their patients' families have suffered and will continue to suffer harm because of the deletion of many of these resources.

19.     Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services and is responsible for overseeing HHS's operations and programs, including the implementation of executive orders by HHS staff. He is sued in his official capacity.

20.     Defendant Department of Health and Human Services is a federal agency within the meaning of the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1). Its mission "is to enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services."[12]

---

[10] *About Us*, Nat'l LGBT Cancer Network, https://cancer-network.org/about (last visited May 19, 2025).

[11] *About Us*, VMS, https://vtmd.org/about-us (last visited May 19, 2025).

[12] *About HHS*, HHS, https://www.hhs.gov/about/index.html (last visited May 19, 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 9
(No. 2:25-cv-00955-LK)

21.    Defendant Director of the Centers for Disease Control and Prevention ("CDC Director") is responsible for overseeing CDC's operations and programs, including the implementation of executive orders by CDC staff.[13]

22.    Defendant Centers for Disease Control and Prevention is an agency within HHS that is part of the U.S. Public Health Service. CDC is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1). "CDC works 24/7 to protect America from health, safety and security threats, both foreign and in the U.S. . . . To accomplish [its] mission, CDC conducts critical science and provides health information that protects our nation against expensive and dangerous health threats and responds when these arise."[14]

23.    Defendant Jay Bhattacharya is the Director of the National Institutes of Health ("NIH") and is responsible for overseeing NIH's operations and programs, including the implementation of executive orders by NIH staff. He is sued in his official capacity.

24.    Defendant National Institutes of Health is an agency within HHS that is part of the U.S. Public Health Service. NIH is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1). Its "mission is to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability," and its stated goals include "develop[ing], maintain[ing], and renew[ing] scientific human and physical resources that will ensure the Nation's capability to prevent disease" and "expand[ing] the knowledge base in medical and

---

[13] The identity of the Acting CDC Director is currently in dispute, *see, e.g.*, Melody Schreiber, *Who Is in Charge at the US Centers for Disease Control and Prevention?*, Guardian (June 29, 2025), https://www.theguardian.com/us-news/2025/jun/29/who-is-in-charge-at-the-cdc, and CDC's website does not list an acting director, *see CDC Leadership*, CDC (May 4, 2025), https://www.cdc.gov/about/leadership/index.html.

[14] *About CDC*, CDC (Feb. 12, 2024), https://www.cdc.gov/about/cdc/index.html.

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 10
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    associated sciences in order to enhance the Nation's economic well-being and ensure a continued

2    high return on the public investment in research."[15]

3        25.    Defendant Martin A. Makary is the Commissioner of Food and Drugs and is

4    responsible for overseeing the operations and programs of the Food and Drug Administration

5    ("FDA"), including the implementation of executive orders by FDA staff. He is sued in his official

6    capacity.

7        26.    Defendant Food and Drug Administration is an agency within HHS that is part of

8    the U.S. Public Health Service. FDA is a federal agency within the meaning of the PRA, 44 U.S.C.

9    § 3502(1), and the APA, 5 U.S.C. § 551(1). "FDA is responsible for advancing the public health

10   by helping to speed innovations that make medical products more effective, safer, and more

11   affordable and by helping the public get the accurate, science-based information they need to use

12   medical products and foods to maintain and improve their health."[16]

13       27.    Defendant Thomas J. Engels is the Administrator of the Health Resources and

14   Services Administration ("HRSA") and is responsible for overseeing HRSA's operations and

15   programs, including the implementation of executive orders by HRSA staff. He is sued in his

16   official capacity.

17       28.    Defendant Health Resources and Services Administration is an agency within HHS

18   that is part of the U.S. Public Health Service. HRSA is a federal agency within the meaning of the

19   PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1). Its mission is "[t]o improve health

20   outcomes through access to quality services, a skilled health workforce, and innovative, high-value

21   programs."[17]

22

23

---

24   [15] *Mission and Goals*, NIH, https://www.nih.gov/about-nih/what-we-do/mission-goals

25   (Oct. 24, 2024).

26   [16] *What We Do*, FDA, https://www.fda.gov/about-fda/what-we-do (Nov. 21, 2023).
     [17] *About HRSA*, HRSA, https://www.hrsa.gov/about (Feb. 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTION RELIEF – 11
(No. 2:25-cv-00955-LK)

29.     Defendant Charles Ezell is the Acting Director of the Office of Personnel Management ("OPM") and is responsible for drafting and promulgating the guidance that gave rise to the acts and decisions challenged in this action. He is sued in his official capacity.

30.     Defendant Office of Personnel Management is a federal agency within the meaning of the PRA, 44 U.S.C. § 3502(1), and the APA, 5 U.S.C. § 551(1). OPM "lead[s] federal agencies in workforce policies, programs, and benefits in service to the American people."[18]

## JURISDICTION AND VENUE

31.     The Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States, including the APA, 5 U.S.C. § 500 et seq. The Court also has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1361 because this action seeks to compel officers of the United States or an agency thereof to perform a duty owed to Plaintiffs.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e). Defendants are officers or employees of the United States acting in their official capacities, and Plaintiffs WSMA, WSNA, and WCAAP are located in this district. No real property is involved in this action.

33.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

## FACTUAL ALLEGATIONS

### The Importance of Data in the U.S. Public Health Infrastructure

34.     The United States has one of the most advanced systems for public health research in the world. This competitiveness is by design: Congress has enacted several laws to support the development of the nation's world-class public health research sector, including the Public Health Service Act ("PHSA"), 42 U.S.C. § 201 et seq. The U.S. Public Health Service includes HHS,

---

[18] *Mission & History*, OPM, https://www.opm.gov/about-us/mission-history (last visited May 19, 2025).

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    CDC, NIH, FDA, and HRSA, as well as other agencies and subagencies. *See* Statement of

2    Organization, Functions and Delegations of Authority, 88 Fed. Reg. 10,125 (Feb. 16, 2023). Each

3    department or agency provides vital health resources and research to state and local governments,

4    clinicians, research institutions, and the public. In the eight decades since Congress enacted the

5    PHSA, these resources have helped facilitate transformative medical breakthroughs, from

6    pioneering the polio vaccine to developing treatments for HIV to sequencing the human genome.

7          35.    Today, these resources remain essential to safeguarding public health in the United

8    States. Federal public health data provides the evidentiary bases necessary for informed decision-

9    making, in contexts both ordinary and extraordinary: In addition to helping address day-to-day

10   issues, healthcare workers rely on federal data to monitor the spread of infectious diseases, identify

11   outbreaks, and implement measures to contain them.

12         36.    Federal public health data is also crucial for identifying and addressing health

13   disparities. Disaggregating data by certain factors—including race, ethnicity, sexual orientation,

14   gender, and geographic location—allows physicians, researchers, and state and local governments

15   to uncover inequities in health outcomes and access to care, which is necessary for developing

16   policies and programs that support at-risk communities. Public health data plays a key role in

17   raising public awareness and educating communities about health risks and preventive measures.

18   By disseminating data on health trends and risk factors, public health agencies can inform the

19   public and encourage behaviors that promote health and prevent disease.

20         37.    Federal agencies are aware of the importance of sharing and disseminating public

21   health data: In 2018, HHS explained that the "move to make more data publicly available, under

22   the banner of the open data movement, is seen as essential to making government itself more

23

24

25

26

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 13
(No. 2:25-cv-00955-LK)

1    open."[19] In the same report, HHS stated that sharing its data with health agencies and the public is

2    "essential to understanding the nation's health."[20]

3          38.    Before the mass deletion of federal data at issue in this litigation, many researchers,

4    nonprofits, state agencies, journalists, doctors, advocacy organizations, and members of the public

5    relied on federal data to conduct research or investigations on topics ranging from public health to

6    economics. For years, the federal data was maintained and updated regularly, and countless

7    organizations relied on the data on a daily basis. For example, WSMA, WSNA, IAPAC, and VMS

8    all relied on federal health information to educate their members and affiliates about best practices

9    and provide up-to-date guidance to improve outcomes for patients.

10          39.    The deletion of the federal data negatively impacts a wide range of entities and

11    individuals. Healthcare professionals lost access to important diagnostic tools and reference

12    materials on various illnesses. Academics and researchers lost access to some of the largest and

13    longest-running datasets on health behaviors. Epidemiologists lost access to critical tools for

14    monitoring disease outbreaks. Public health officials lost access to valuable resources that help

15    inform the public. For state and local governments, the deletion of federal data represents the

16    removal of these tools and a fundamental impairment of their police powers to promote public

17    health and welfare. And, of course, patients are disadvantaged by the deletion of resources that

18    inform healthcare workers who provide care and counseling. These harms are even greater for

19    members of at-risk and vulnerable populations.

20    **The Purge of Federal Health Data**

21          40.    Executive Order 14168, titled "Defending Women from Gender Ideology

22    Extremism and Restoring Biological Truth to the Federal Government," was signed on January

23    20, 2025. Exec. Order No. 14168, 90 Fed. Reg. 8,615 (Jan. 20, 2025) (the "Gender Ideology

24

25        [19] *The State of Data Sharing at the U.S. Department of Health and Human Services*, HHS 4
(Sept. 2018), https://www.hhs.gov/sites/default/files/HHS_StateofDataSharing_0915.pdf.

26        [20] *Id.*

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 14
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

EO").[21] The Gender Ideology EO directed the executive branch to "enforce all sex-protective laws to promote" two sexes, male and female, and adopted several new definitions associated with different aspects of sex and gender. *Id.* § 2. These definitions defined "gender ideology" as a concept that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id.* § 2(f). Section 3 of the Gender Ideology EO directed executive agencies to take a number of actions, including the removal of "all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology." *Id.* § 3(e). The Gender Ideology EO did not provide a timeline for the removal of these messages.

41.    Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," was signed the same day. Exec. Order No. 14151, 90 Fed. Reg. 8,339 (Jan. 20, 2025) (the "DEI EO").[22] It directed senior officials, including the OPM Director, to terminate mandates, policies, programs, preferences, and activities related to diversity, equity, inclusion, and accessibility. *Id.* § 2(a). It further directed executive agencies to terminate all actions, initiatives, or programs related to "equity" within sixty days. *Id.* § 2(b)(i).

42.    According to one report, the promulgation of the Gender Ideology EO and the DEI EO forced public health officials at agencies such as NIH to scan "for activities, websites, grants and programs that might need to be modified or pulled down."[23]

---

[21] The Gender Ideology EO is available at https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government.

[22] The DEI EO is available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing.

[23] Carolyn Y. Johnson & Joel Achenbach, *NIH Reels with Fear, Uncertainty About Future of Scientific Research*, Wash. Post (Mar. 5, 2025), https://www.washingtonpost.com/science/2025/03/05/nih-trump-turmoil-grants.

FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 15
(No. 2:25-cv-00955-LK)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

43.    On January 29, 2025, Defendant Ezell sent a memorandum to heads and acting heads of executive agencies with the subject line "Initial Guidance Regarding President Trump's Executive Order *Defending Women*." Memorandum from Charles Ezell (Jan. 29, 2025) (the "Ezell Memo").[24] Under the purported authority of 5 U.S.C. § 1103(a)(1) and (a)(5), the Ezell Memo directed executive agencies to "take prompt actions to end all agency programs that use taxpayer money to promote or reflect gender ideology as defined" in the Gender Ideology EO. *Id.* at 1. These actions included the review and termination of "all agency programs, contracts, and grants . . . that promote or inculcate gender ideology." *Id.* The Ezell Memo also required agencies to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology." *Id.* The Ezell Memo imposed a deadline of 5:00 p.m. ET on January 31, *id.*—less than two days after agency representatives received the directive.

44.    The evening of January 29, Nate Brought, then-Director of the NIH Executive Secretariat, urged Matthew J. Memoli, then-Acting NIH Director, not to comply with the Gender Ideology EO and Ezell Memo, which he collectively described as "destructive, divisive, and discriminatory."[25]

45.    On January 31, 2025, executive agencies started the mass deletion of webpages and other public-facing internet resources as a part of their efforts to comply with the requirements imposed by the Ezell Memo. The resulting data purges were as extensive as they were hasty: According to an analysis by *The New York Times*, the federal government deleted more than *8,000* webpages across more than a dozen websites.[26] Executive agencies did not appear to provide any

---

[24] The Ezell Memo is available at https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-regarding-trump-executive-order-defending-women-1-29-2025-final.pdf.

[25] Johnson & Achenbach, *supra* note 22.

[26] Ethan Stinger, *Thousands of U.S. Government Web Pages Have Been Taken Down Since Friday*, N.Y. Times (Feb. 2, 2025), https://www.nytimes.com/2025/02/02/upshot/trump-government-websites-missing-pages.html.

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 16
(No. 2:25-cv-00955-LK)

public guidance regarding the resources they chose to delete, nor could any obvious patterns be inferred from the deletions on agency websites.

46.     Nowhere was this confusion more evident than on the websites of the federal public health agencies. The *Times* analysis concluded that CDC deleted more than 3,000 pages from its website, covering topics ranging from chronic-disease prevention to the symptoms of Alzheimer's disease.[27] While the purges were most evident at CDC, other public health agencies such as FDA also deleted webpages from their sites.[28] The deletions ranged from some of the government's largest and longest-running research databases to the webpages of HHS offices to individual research articles. Vital information about communicable diseases, vaccines, and sexually transmitted disease prevention was—suddenly and without notice—no longer accessible by doctors, nurses, public health officials, and members of the public.

47.     These purges immediately prompted widespread shock and outrage among public health practitioners and researchers, who regularly rely on federal resources to treat patients, conduct epidemiological research, and monitor disease outbreaks. Researchers and public health officials lost access to CDC's Behavioral Risk Factor Surveillance System and Youth Risk Behavior Surveillance System, which for decades have helped reveal behavioral patterns and public health trends. Local governments and public health organizations lost access to CDC's Social Vulnerability Index and HHS's Area Health Resource Files, which have provided critical information about the public health infrastructures and socioeconomic vulnerabilities in their communities. Pharmaceutical researchers lost access to FDA-hosted studies regarding best practices for clinical trials. Doctors lost access to guidelines and reference materials that help them treat patients more efficiently. And members of the public lost access to fact sheets and other informational resources that could help them better understand their diagnoses and healthcare.

---

[27] *Id.*

[28] *Id.*

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 17
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

48.    As news of the data purges spread widely, nonprofits, universities, and volunteer groups of concerned citizens took action to preserve as much as possible of the public health data and resources that remained available online. However, these admirable (and ad hoc) efforts did not reduce the scope of the harm caused by the deletions. Some of the preserved data is limited or incomplete. Other preserved data is accessible only after paying a subscription fee. And some of the preserved data is not searchable or usable. These criticisms also apply to resources such as the online "Wayback Machine," which contains an archive of the webpages that were subsequently deleted and restored. The Wayback Machine, while expansive, does not include every site because its "automated crawlers were unaware of [the site's] existence at the time of the crawl."[29] This is true for several federal webpages and resources that were deleted.

49.    In the face of a justified public outcry, the federal government partially relented. By the beginning of the following week, federal agencies had restored certain websites, datasets, and resources. For instance, the Behavioral Risk Factor Surveillance System was reinstated, along with research on disparities in perceived health statuses among patients with cardiovascular disease. Additionally, information on HIV testing and resources on contraceptive guidance for healthcare professionals were republished on CDC's website.

50.    While public health practitioners and researchers were relieved to see critical resources come back online, there has been significant uncertainty about the content and quality of the restored resources. Many of these resources were not restored entirely. For example, while CDC brought the Behavioral Risk Factor Surveillance System back online, it did not restore an associated screening questionnaire that organizations regularly use to learn patient behaviors and monitor emerging public health trends.

---

[29] *See Using the Wayback Machine*, Internet Archive, https://help.archive.org/help/using-the-wayback-machine (last visited May 19, 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 18
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

51.    Moreover, some resources have been restored with a prominent disclaimer undermining the reliability of the information. For example, CDC and the Agency for Toxic Substances and Disease Registry produce the Social Vulnerability Index, which "is a place-based index, database, and mapping application designed to identify and quantify communities experiencing" "demographic and socioeconomic factors (such as poverty, lack of access to transportation, and crowded housing) that adversely affect communities that encounter hazards and other community-level stressors."[30] A text box at the top of the Social Vulnerability Index's landing page reads as follows:

> Per a court order, HHS is required to restore this website as of 11:59PM ET, February 11, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.

52.    Other CDC webpages, including the Youth Risk Behavior Surveillance System,[31] feature the same disclaimer.

53.    Similarly, although the Behavioral Risk Factor Surveillance System and PRAMS are back online, they are apparently being "modified":[32]

> CDC's website is being modified to comply with President Trump's Executive Orders.

54.    The consequences of these disclaimers extend from practitioners to their patients. Medical professionals have reported that they are worried about the accuracy and bias of the information that has been restored, while the language employed has a deleterious effect on certain patient populations. As one WSMA member explained, "I am spending hours a week (sometimes

---

[30] *Social Vulnerability Index*, CDC (July 22, 2024), https://www.atsdr.cdc.gov/place-health/php/svi/index.html.

[31] *Youth Risk Behavior Surveillance System (YRBSS)*, CDC, https://www.cdc.gov/yrbs/index.html (last visited May 19, 2025).

[32] *Behavioral Risk Factor Surveillance System*, CDC, https://www.cdc.gov/brfss/index.html (last visited May 19, 2025); *Pregnancy Risk Assessment Monitoring System (PRAMS)*, CDC, https://www.cdc.gov/prams/index.html (last visited May 19, 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 19
(No. 2:25-cv-00955-LK)

1    hours a day) reassuring patients I can still dig up appropriate information for their health if I need

2    to. . . . My patient[s'] mental health is worsening[,] creating greater health care burden because on

3    some websites . . . there is medically inaccurate and discriminatory language on the page that is

4    hurtful specifically to them."

5        55.    Notwithstanding legal challenge, *see supra* note 2, and the restoration of some

6    websites, the purge of public health information has not ceased. An email reportedly sent in March

7    from NIH to scientists associated with federally funded repositories of human data indicated that

8    the federal government is continuing to review databases to ensure compliance with the Gender

9    Ideology EO.[33] Former NIH Director Joshua Gordon called the removal of data on gender identity

10   from these repositories "incredibly disturbing."[34] Even for websites and datasets that remain

11   accessible and operational, the reliability of the information provided has been called into question:

12   A study published by *The Lancet* found that, of a cohort of 232 federal datasets that were modified

13   between January 20 and March 25, 2025, "114 (49%) . . . were substantially altered" and "[o]nly

14   15 (13%) of the 114 altered datasets logged or otherwise indicated that the change had occurred."[35]

15       56.    On July 10, 2025, Defendant Ezell circulated a memorandum titled "Updated

16   Guidance Regarding Executive Order 14168, *Defending Women from Gender Ideology Extremism*

17   *and Restoring Biological Truth to the Federal Government*." Memorandum from Charles Ezell

18   (July 10, 2025).[36] Although the new memorandum "fully replaces and supersedes" the Ezell

19   Memo, *id.* at 1 n.1, and did not include the earlier directive to "[t]ake down all outward facing

20

21   ---

     [33] Angie Voyles Askham, *U.S. Human Data Repositories 'Under Review' for Gender*

22   *Identity Descriptors*, Transmitter (Apr. 9, 2025), https://www.thetransmitter.org/policy/u-s-
     human-data-repositories-under-review-for-gender-identity-descriptors.

23       [34] *Id.*

24       [35] Janet Freilich & Aaron S. Kesselheim, *Data Manipulation Within the US Federal*
     *Government*, Lancet (July 3, 2025), https://www.thelancet.com/journals/lancet/article/PIIS0140-
     6736%2825%2901249-8/fulltext.

25       [36] This memorandum is available at https://www.opm.gov/policy-data-oversight/latest-

26   memos/updated-guidance-regarding-executive-order-14168-defending-women-from-gender-
     ideology-extremism-and-restoring-biological-truth-to-the-federal-government.

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 20
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  media (websites, social media accounts, etc.) that inculcate or promote gender ideology," Ezell

2  Memo 1, it did not order or otherwise require the restoration of websites, information, and

3  resources that were previously removed.

4      57.    Today, vast amounts of federal data, research, and resources remain deleted. *See*

5  App. A. Plaintiffs are unable to access vital resources they had used daily until the data purge. And

6  the scope of harm from the deletions only grows each day as Plaintiffs discover more deleted data.

7  It is unclear how much data Defendants deleted as a part of their initial purge, just as it is unclear

8  how much remains offline today.

9  **Harms to Plaintiffs, Their Members, and the Public**

10      58.    Plaintiffs have suffered and will continue to suffer irreparable harm resulting from

11  Defendants' deletion of public health data, webpages, and resources.

12      59.    WSMA members—who reflect a broad range of medical practices from family

13  medicine and pediatrics to emergency medicine, infectious diseases, and psychiatry—have

14  experienced injury as a result of Defendants' actions, with one member calling "[t]he extent of the

15  removals [] breathtaking." Many members used the now-deleted websites regularly and have seen

16  their practices directly harmed by the removal of information and resources. One member reported

17  their difficulty finding the latest information related to health outcomes that might inequitably

18  impact certain patients, while another noted that the deletions made it more difficult to care for

19  transgender patients and patients with HIV and substance-use disorders. Several WSMA members

20  noted that information about vaccinations, immunizations, and high-risk infectious diseases like

21  Mpox is no longer available, with one member commenting, "If the CDC isn't able to publish

22  information about new virus outbreaks, the consequences will be grave, for obvious reasons." As

23  another WSMA member summed up: "Many of these diseases are on the rise and this is not the

24  time to hide from science."

25      60.    WSMA itself has also suffered direct harm from the deletion of federal resources.

26  It maintains a comprehensive website that hosts a significant amount of medical information to

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 21
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    support care providers and inform the general public. The WSMA website contains medical

2    information provided by federal health agencies, and the websites are linked together. The

3    deletions have forced WSMA to spend significant amounts of time and resources to ensure its

4    website does not direct users to broken links or deleted resources. For example, a WSMA webpage

5    titled "Caring for Your LGBTQ+ Patients" links to an HHS resource from the Substance Abuse

6    and Mental Health Services Administration that is no longer available.[37]

7        61.    WSNA and its members have identified dozens of databases and resources they

8    regularly relied on that were affected by Defendants' actions. Although some of these have been

9    restored (albeit with disclaimers) as a result of other litigation, *see supra* note 2—for example, the

10   Social Vulnerability Index and FDA's guidance document titled "Diversity Action Plans to

11   Improve Enrollment of Participants from Underrepresented Populations in Clinical Studies"[38]—

12   others remain offline. These include HRSA FAQs for Mpox treatment,[39] HRSA information about

13   opioid use among women,[40] various resources on health issues affecting the LGBTQ+

14   community,[41] guidance to integrate diversity and inclusion in work related to mental health

15

16

---

17   [37] *Caring for Your LGBTQ+ Patients*, WSMA, https://wsma.org/wsma/foundation/health-
18   equity/caring-for-your-lgbt-patients/wsma/foundation/health-equity/caring-for-your-lgbt-
     patients.aspx (last visited May 19, 2025) (click "Top Health Issues for LGBT Populations
     Information & Resource Kit" link).

19   [38] *Guidance Document: Diversity Action Plans to Improve Enrollment of Participants from
20   Underrepresented Populations in Clinical Studies*, FDA (June 2024),
     https://www.fda.gov/regulatory-information/search-fda-guidance-documents/diversity-action-
21   plans-improve-enrollment-participants-underrepresented-populations-clinical-studies.

     [39] These FAQs were previously available at https://www.hrsa.gov/mpox-faqs.

22   [40] This information was previously available at https://www.hrsa.gov/office-womens-
23   health/opioid-use-in-women.

     [41] These resources were previously available at https://www.hhs.gov/programs/topic-
24   sites/lgbtqi/enhanced-resources/reports/index.html,        https://www.hhs.gov/programs/topic-
     sites/lgbtqi/reports/health-objectives-2015.html,           https://www.cdc.gov/tobacco-health-
25   equity/collection/lgbtq.html,        https://www.cdc.gov/tobacco-health-equity/collection/lgbtq-
     quitting-tobacco.html, and https://www.fda.gov/news-events/fda-voices/advancing-clinical-trial-
26   participation-lgbtqia-community.

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 22
(No. 2:25-cv-00955-LK)

1    assistance for the homeless,[42] training modules from NIH's Office of Research on Women's

2    Health,[43] information related to transgender behavioral health disparities,[44] an HHS reading list

3    titled "Advancing Better Health Through Better Understanding for Black and African American

4    Communities: Health Literacy, Health Care Access, and Culturally Appropriate Care,"[45] and

5    HHS's website dedicated to reproductive rights.[46] Having lost these "gold-standard" resources,

6    WSNA members report having to spend additional time searching for new sources to inform their

7    practices and share with their patients and students.

8            62.    WCAAP members previously used deleted and affected websites to inform their

9    work with teenaged patients—including in particular the Youth Risk Behavior Surveillance

10   System, which provides critical longitudinal data to identify new trends in adolescent health and

11   guides evidence-based interventions. This data was, for example, an early warning system for the

12   sharp increase in youth nicotine use in new forms. Without these resources, WCAAP members are

13   unable to access data-based best practices to treat young patients, including in particular LGBTQ+

14   patients and patients of color.

15           63.    AcademyHealth members, like other medical practitioners, have lost access to

16   resources they used daily to make evidence-based decisions and provide critical information to

17   their patients. Several members have reported facing difficulties due to the uncertain status of

18   PRAMS, which currently features a disclaimer undermining its reliability.[47] An AcademyHealth

19   blog post explored the current state of PRAMS—"[o]ne of the key datasets for maternal and child

---

[42]    This    guidance    was    previously    available    at
https://soarworks.samhsa.gov/article/guidance-for-improving-staff-engagement.

[43]    These    modules    were    previously    available    at    https://orwh.od.nih.gov/career-
development-education/e-learning.

[44]    This    information    was    previously    available    at
https://library.samhsa.gov/sites/default/files/transgender-behavioral-health-pep24-05-004.pdf.

[45]    This reading list was previously available at https://www.hhs.gov/black-history-
month/reading-list/index.html.

[46]  This website was previously available at https://reproductiverights.gov.

[47]  *See PRAMS, supra* note 31.

1   health"—noting that, though CDC "stated that the 2023 data would be available to states in March

2   and that 2025 data collection would resume in April, [] there is no indication that either action has

3   been carried out."[48] Indeed, "as a part of the massive [HHS] layoffs, the entire PRAMS survey

4   team at the CDC Department of Reproductive Health was laid off."[49] Other AcademyHealth

5   members have cited PRAMS issues as a particular hardship: Disruption of PRAMS and Social

6   Vulnerability Index data has interfered with public health research, for instance, while students

7   who rely on PRAMS and other data for their projects and are both impacted by the removal of data

8   and concerned about the integrity of the information that remains.

9       64.    ANAC members have observed a particularly troubling development related to

10  NIH's Office of AIDS Research. The previous version of a study titled "Guidelines for the Use of

11  Antiretroviral Agents in Adults and Adolescents With HIV" contained extensive information about

12  the treatment of HIV for transgender patients, noting that, "[b]ecause transgender and nonbinary

13  people bear a disproportionate burden of HIV, it is important for HIV care providers to be

14  knowledgeable about the specific HIV care needs of these individuals."[50] The version of these

15  guidelines currently available omits the discussion of transgender patients in its entirety.[51] Given

16  that national surveys indicate that 1.14% of the U.S. adult population—3 million people—identify

17  as transgender, and that the most recent estimate of global HIV prevalence among transgender

18

19

---

20  [48] *Attacks on Data Accessibility Turn to Maternal Health: How States Can Help*, AcademyHealth (Apr. 17, 2025), https://academyhealth.org/blog/2025-04/attacks-data-accessibility-turn-maternal-health-how-states-can-help.

21

22  [49] *Id.*

    [50] *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV*, HHS

23  Panel on Antiretroviral Guidelines for Adults and Adolescents I-100, https://web.archive.org/web/20250215012441/https://www.hivma.org/globalassets/hivma/guidelines-

24  and-other-resources/1-guidelines-adult-adolescent-arv.pdf (archived version as of Feb. 15, 2025).

25  [51] *See Guidelines for the Use of Antiretrovial Agents in Adults and Adolescents With HIV*, HHS Panel on Antiretroviral Guidelines for Adults and Adolescents, https://clinicalinfo.hiv.gov/

26  sites/default/files/guidelines/documents/adult-adolescent-arv/guidelines-adult-adolescent-arv.pdf (last visited May 19, 2025).

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 24
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

people is 19.9% among transgender women and 2.6% among transgender men,[52] removing access to these resources impedes the ability of ANAC members to treat marginalized patients suffering from HIV. Other ANAC members rely on CDC's Medical Monitoring Project, which "collects data on, and provides information about the behaviors, clinical outcomes, quality of care, and barriers to care and viral suppression among people with diagnosed HIV in the United States"; this website now includes the disclaimer described above. *See supra* ¶ 51.[53] The same disclaimer also appears on a CDC website that provides "information, tools, and resources . . . to deliver high-impact HIV prevention strategies in communities across the nation."[54]

65.    ANAC as an organization has lost access to HIV-related resources it previously used to educate members, nursing students, and the public on issues including HIV treatment and prevention, related comorbidities, aging with HIV, and other considerations, especially as they impact vulnerable populations.

66.    FTCI supports a network of fifty U.S. cities and counties committed to ending the HIV epidemic by 2030 through data-informed, equity-based, and community-driven strategies—and the omission or deletion of data from federal websites is severely impeding the ability of city and county health departments to tailor public health responses to the needs of key populations. The types of disaggregated data that are essential to FTCI's mission include incidence and prevalence of HIV stratified by gender identity, age, race/ethnicity, geography, risk category, and socioeconomic status; viral suppression rates among key populations; and service utilization metrics from federally funded programs. Such data enables the development of dashboards, community profiles, and scorecards that track progress toward goals and identify barriers to success, and the omission of these disaggregated metrics weakens the data infrastructure on which

---

[52] *Guidelines*, *supra* note 47, at I-101.

[53] *Medical Monitoring Project (MMP)*, CDC, https://www.cdc.gov/hiv-data/mmp/index.html (last visited May 19, 2025).

[54] *Ending the HIV Epidemic in the US Partner and Grantee Resources*, CDC, https://www.cdc.gov/ehe/php/partner-grantee-resources/index.html (last visited May 16, 2025).

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

FTCI's network depends to design targeted prevention and treatment interventions, engage with affected communities informed by population-specific data, and identify and address health disparities in their communities. Of particular concern is the virtual disappearance of transgender-specific data and resources from key federal websites, which has reduced not only the visibility of transgender people in national public health surveillance but also the availability of federal guidance related to clinical care, service delivery, and culturally competent engagement. Transgender individuals, who are among the most disproportionately impacted by HIV, are now functionally invisible in the very systems that purport to serve them—placing an undue burden on FTCI and the local jurisdictions it supports to fill critical data and policy gaps.

67.    IAPAC is injured in particular by the deletion of federal guidance on HIV, which undermines its continuing medical education ("CME") and professional-development efforts. Many IAPAC clinician-members access training modules linked to federal HIV clinical guidance for their ongoing CME requirements, certification, and credentialing. Without a stable and trustworthy federal resource base, IAPAC clinician-members risk relying on outdated or incomplete content, which might jeopardize clinical licensure or certification and diminish the overall quality of care. Moreover, IAPAC's Mpox webpage—which was created to rapidly disseminate evidence-based clinical guidance during the 2022–2023 Mpox outbreak[55]—has also been affected. The removal or redaction of key guidance on testing, vaccination, transmission prevention, and clinical management from federal websites has directly compromised the ability of IAPAC members to protect high-risk populations. In some cases, the absence of clear, accessible guidance might have contributed to delays in diagnosis and treatment, worsening outcomes.

68.    Additionally, IAPAC's AIDS InfoNet webpage,[56] which aggregates simplified and multilingual clinical fact sheets for patient education, is deeply integrated with external resources

---

[55] *IAPAC Mpox Guidance*, IAPAC, https://www.iapac.org/2022/05/23/iapac-issues-monkeypox-rapid-guidance (July 25, 2023).

[56] *AIDS InfoNet*, IAPAC, https://www.iapac.org/hivconnect/aids-infonet (last visited May 19, 2025).

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

provided by federal agencies, especially CDC. As a result of these deletions, many links from IAPAC.org to these federal resources are now broken, creating significant informational voids for both clinicians and their patients. This disruption not only undermines patient education and health literacy but also impedes clinicians' ability to share accurate, timely information critical to treatment adherence and viral suppression in HIV care to achieve an undetectable viral load, which offers both therapeutic and preventive benefits—a near-normal lifespan and zero risk of transmitting HIV sexually. Indeed, a vast majority of IAPAC clinician-members surveyed reported that their ability to deliver HIV-related services has been affected by the removal of public health information.

69.     The Network has been directly harmed by, for example, the deletion of (and, now, alterations to) the Behavioral Risk Factor Surveillance System. Given its large scale, the system facilitates a critical surveillance program for vulnerable and minority populations, collecting data with a level of specificity and precision that other, smaller studies cannot match. The Network uses this data for activities such as targeted smoking-cessation efforts among LGBTQ+ populations. Losing the ability to report and collect data has hampered both the Network's internal efforts and its ability to advise state and local public health departments.

70.     VMS members—many of whom are practicing physicians—have reported that the deletion of federal resources has affected their practices. Information that was for years easily accessible is now difficult or impossible to find, impacting their delivery of primary care. And the unavailable resources are not the only cause for concern among VMS members; the disclaimers that accompany some of the websites restored as a result of other litigation, *see supra* note 2, have discouraged practitioners from relying on the information provided. Indeed, VMS members have reported that patients are now refusing to answer questions regarding sexuality and gender and are refusing vaccinations. Among the affected resources on which VMS members rely are HHS data

1    dashboards resulting from the U.S. President's Emergency Plan for AIDS Relief ("PEPFAR"),[57]

2    FDA's Study of Sex Differences in the Clinical Evaluation of Medical Products,[58] and the webpage

3    for NIH's Sexual & Gender Minority Research Office.[59]

4                                    **CLAIMS FOR RELIEF**

5                                  **FIRST CLAIM FOR RELIEF**
                           **Violation of the Administrative Procedure Act**
6                     **(On Behalf of All Plaintiffs Against All Defendants)**

7            71.    The foregoing allegations are repeated and incorporated as though fully set forth

8    herein.

9            72.    The APA empowers courts to review any "final agency action for which there is no

10   other adequate remedy in a court." 5 U.S.C. § 704. The U.S. District Court for the District of

11   Columbia has already determined that the deletion of public health resources from federal websites

12   likely constitutes final agency action for purposes of the APA. *See Drs. for Am. v. OPM*, No. 25-

13   322 (JDB), 2025 WL 452707, at *4–7 (D.D.C. Feb. 11, 2025); *supra* note 2.

14           73.    The APA further empowers courts to hold unlawful and set aside final agency

15   actions that are arbitrary and capricious; an abuse of discretion or otherwise not in accordance with

16   the law; contrary to a constitutional right, power, privilege, or immunity; or in excess of a statutory

17   jurisdiction, authority, or limitation or short of statutory right. 5 U.S.C. § 706.

18           74.    The APA's arbitrary-and-capricious standard "requires that agency action be

19   reasonable and reasonably explained" through the articulation of "a rational connection between

20

21

---

22   [57] These data dashboards were previously available at https://data.pepfar.gov. Although the
     PEPFAR website now features an update—"Please note **Data.PEPFAR.Gov** is currently
23   undergoing updates and will return soon with refreshed data and interactive dashboards"—it is
     unclear when the dashboards will return and in what condition.
24
     [58] *Guidance Document: Study of Sex Differences in the Clinical Evaluation of Medical
25   Products*, FDA (Jan. 2025), https://www.fda.gov/regulatory-information/search-fda-guidance-
     documents/study-sex-differences-clinical-evaluation-medical-products (includes disclaimer).
26           [59] This webpage was previously available at https://dpcpsi.nih.gov/sgmro.

FIRST SUPPL. COMPL. FOR DECLARATORY &              **Perkins Coie LLP**
INJUNCTIVE RELIEF – 28                       1301 Second Avenue, Suite 4200
(No. 2:25-cv-00955-LK)                            Seattle, Washington 98101
                                                  Phone: +1.206.359.8000
                                                   Fax: +1.206.359.9000

1    the facts found and the choice made." *League of Cal. Cities v. FCC*, 118 F.4th 995, 1013 (9th Cir.

2    2024).

3        75.    Defendants' actions to implement the Gender Ideology EO, DEI EO, and Ezell

4    Memo constitute a legislative rule issued without observance of the notice-and-comment

5    procedure required by 5 U.S.C. § 553.

6        76.    In addition, Defendants' actions were arbitrary and capricious because Defendants

7    never articulated a rational connection between the purported harms of "gender ideology" and DEI

8    and the decision to delete specific public health webpages and resources.

9        77.    Defendants' deletion of public health webpages and resources must therefore be set

10   aside pursuant to the APA.

11   **SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**

12   **(On Behalf of All Plaintiffs Against Defendant Ezell)**

13       78.    The foregoing allegations are repeated and incorporated as though fully set forth

14   herein.

15       79.    The Ezell Memo cites 5 U.S.C. § 1103(a)(1) and (a)(5) as the statutory bases for its

16   authority to direct agency heads to end programs promoting or reflecting gender ideology and take

17   down websites that purportedly inculcate or promote gender ideology.

18       80.    The former statutory provision gives the OPM Director authority to secure

19   "accuracy, uniformity, and justice in the functions of the Office." 5 U.S.C. § 1103(a)(1). The latter

20   gives the OPM Director authority to execute, administer, and enforce "the civil service rules and

21   regulations of the President and the Office and the laws governing the civil service; and the other

22   activities of the Office including retirement and classification activities." *Id.* § 1103(a)(5).

23       81.    These statutes do *not* confer authority on the OPM Director to direct agency heads

24   to take down webpages and resources from their websites, particularly when these webpages and

25   resources do not implicate the civil service or employment practices. Defendant Ezell thus lacked

26

the statutory authority to promulgate the Ezell Memo. His actions were not in accordance with the law and were in excess of his statutory authority.

82.     The Ezell Memo's guidance directing the deletion of public health webpages and resources must therefore be set aside pursuant to the APA.

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Paperwork Reduction Act**
**(On Behalf of All Plaintiffs Against Defendants Kennedy, CDC Director, Bhattacharya, Makary, and Engels)**

83.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

84.     The PRA requires federal agencies to "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1). It also requires federal agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id.* § 3506(d)(3). Congress has repeatedly affirmed its commitment to ensuring public access to government information since the PRA's enactment—most recently through the OPEN Government Data Act, Title II of the Foundations for Evidence-Based Policymaking Act. *See* Pub. L. No. 115-435, 132 Stat. 5529 (2019).

85.     The Office of Management and Budget ("OMB") has defined information-dissemination products as "any recorded information, regardless of physical form or characteristics, disseminated by an agency, or contractor thereof, to the public." OMB Circular No. A-130, *Managing Information as a Strategic Resource* 29 (2016).[60]

86.     HHS has further defined information-dissemination products as "documentary material, regardless of physical form or characteristic, an agency disseminates to the public." HHS, Office of the Assistant Secretary for Planning and Evaluation, *HHS Guidelines for Ensuring and*

---

[60]     These guidelines are available at https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/OMB/circulars/a130/a130revised.pdf.

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 30
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

*Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public* (2002).[61] HHS specifically includes "any electronic document, CD-ROM, or web page" in this definition. *Id.*

87.    The public health webpages and resources on the websites of HHS and its constituent agencies constitute significant information-dissemination products.

88.    Defendants' deletion of public health webpages and resources violated their statutory obligation to provide adequate notice when modifying or terminating significant information-dissemination products. Defendants' actions also violated their duty to provide timely and equitable access to the agencies' public information. These actions were therefore not in accordance with the law and were in excess of Defendants' statutory authority.

89.    Defendants' deletion of public health webpages and resources from the web domains of HHS and its constituent agencies must therefore be set aside pursuant to the APA.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Public Health Service Act**
**(On Behalf of All Plaintiffs Against Defendants Kennedy, CDC Director, Bhattacharya, Makary, and Engels)**

90.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

91.    Under the PHSA, HHS shall "encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists" to conduct and promote "research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." 42 U.S.C. § 241(a). In carrying out this duty, HHS is authorized to "collect and make available through publications and other appropriate means, information as to, and the practical application of, such research and other activities." *Id.* § 241(a)(1). HHS is also authorized to "make

---

[61]    These guidelines are available at https://aspe.hhs.gov/hhs-guidelines-ensuring-maximizing-disseminated-information.

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  available, to health officials, scientists, and appropriate public and other nonprofit institutions and

2  organizations, technical advice and assistance on the application of statistical methods to

3  experiments, studies, and surveys in health and medical fields." *Id.* § 241(a)(6).

4        92.    The HHS Secretary has delegated this statutory authority to the CDC Director, the

5  NIH Director, and the FDA Commissioner. *See* General Powers and Duties Under Title III of the

6  Public Health Service Act; Delegation of Authority, 46 Fed. Reg. 42,918 (Aug. 25, 1981); National

7  Institutes of Health; Delegation of Authority, 46 Fed. Reg. 37,341 (July 20, 1981); Delegations of

8  Authority and Organization; Authorities of the Commissioners, 46 Fed. Reg. 50,064 (Oct. 9,

9  1981).

10        93.    In implementing the Gender Ideology EO, DEI EO, and Ezell Memo, Defendants

11  deleted resources from web domains of HHS and its constituent agencies that the federal

12  government had made available regarding physical and mental diseases, including information

13  about epidemiological research and its practical applications and information used to prevent and

14  suppress communicable diseases, promote public health, and enforce quarantine and other health

15  regulations.

16        94.    Defendants' actions therefore violated their duty to encourage, cooperate with, and

17  render assistance to public health authorities in promoting research, investigations, experiments,

18  demonstrations, and studies regarding physical and mental diseases. These actions were not in

19  accordance with the law and were in excess of Defendants' statutory authority.

20        95.    Defendants' deletion of public health webpages and resources from the web

21  domains of HHS and its constituent agencies must therefore be set aside pursuant to the APA.

22  **FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Public Health Service Act**

23  **(On Behalf of All Plaintiffs Against Defendants Kennedy and CDC Director)**

24        96.    The foregoing allegations are repeated and incorporated as though fully set forth

25  herein.

26

1    97.    Under the PHSA, HHS, acting through the CDC Director, shall "implement and
2  exercise applicable authorities and responsibilities provided for in this chapter or other applicable
3  law related to the investigation, detection, identification, prevention, or control of diseases or
4  conditions to preserve and improve public health domestically and globally." 42 U.S.C.
5  § 242c(b)(1). These responsibilities include the CDC Director's delegated authority under
6  42 U.S.C. §§ 241 and 243.

7    98.    Defendants' actions to implement the Gender Ideology EO, DEI EO, and Ezell
8  Memo deleted public health webpages and resources from CDC's website related to the
9  investigation, detection, identification, prevention, or control of diseases. These actions were not
10  in accordance with the law and were in excess of Defendants' statutory authority.

11    99.    Defendants' deletion of public health webpages and resources from the CDC
12  website must therefore be set aside pursuant to the APA.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Public Health Service Act**
**(On Behalf of All Plaintiffs Against Defendants Kennedy and Bhattacharya)**

15    100.    The foregoing allegations are repeated and incorporated as though fully set forth
16  herein.

17    101.    Under the PHSA, HHS, acting through the NIH Director, shall "assemble accurate
18  data . . . to assess research priorities," including "data on study populations of clinical research,
19  funded by or conducted at each national research institute and national center." 42 U.S.C.
20  § 282(b)(4)(B). Such data "is to be made publicly available on the Internet website of the National
21  Institutes of Health." *Id.* § 282(b)(4)(B)(iii).

22    102.    Defendants' actions to implement the Gender Ideology EO, DEI EO, and Ezell
23  Memo deleted from the NIH's website data on study populations of clinical research funded or
24  conducted by national research institutes and national centers. These actions were not in
25  accordance with the law and were in excess of Defendants' statutory authority.

26

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 33
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

103.    Defendants' deletion of data on study populations from the NIH website must therefore be set aside pursuant to the APA.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Public Health Service Act**
**(On Behalf of All Plaintiffs Against Defendants Kennedy and CDC Director)**

104.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

105.    Congress has statutorily authorized the creation of the National Center on Birth Defects and Developmental Disabilities within CDC. *See* 42 U.S.C. § 247b-4(a)(1). Under this statute, HHS and CDC have a duty to carry out programs that "collect, analyze, and make available data on birth defects, developmental disabilities, and disabilities and health." *Id.* § 247b-4(a)(2)(A). They also have a duty to carry out programs that "provide information and education to the public on the prevention of such defects and disabilities." *Id.* § 247b-4(a)(2)(C).

106.    Defendants' actions to implement the Gender Ideology EO, DEI EO, and Ezell Memo deleted webpages and resources that made available data on birth defects, developmental disabilities, and disabilities and health. Defendants' actions also included the deletion of webpages and resources that provided information and education to the public on the prevention of these defects and disabilities. These actions were not in accordance with the law and were in excess of Defendants' statutory authority.

107.    Defendants' deletion of public health webpages and resources from the National Center on Birth Defects and Developmental Disabilities website must therefore be set aside pursuant to the APA.

**EIGHTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and Public Health Service Act**
**(On Behalf of All Plaintiffs Against Defendant Bhattacharya)**

108.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

109.    Under the PHSA, the NIH Director shall require that final, peer-reviewed, and published manuscripts funded by NIH are "made publicly available no later than 12 months after the official date of publication" on the National Library of Medicine's PubMed Central. 42 U.S.C. § 282c.[62]

110.    Additionally, the NIH Director "shall establish a data system for the collection, storage, analysis, retrieval, and dissemination of information regarding research on women's health that is conducted or supported by the national research institutes." *Id.* § 287d-1(a)(1). The information from this system "shall be available through information systems available to health care professionals and providers, researchers, and members of the public." *Id.* The same statute imposes a legal duty on the NIH Director to "establish, maintain, and operate a program to provide information on research and prevention activities of the national research institutes that relate to research on women's health." *Id.* § 287d-1(b).

111.    NIH's actions to implement the Gender Ideology EO, DEI EO, and Ezell Memo have included the deletion of final, peer-reviewed, and published manuscripts funded by NIH that were published more than twelve months prior on PubMed Central. NIH's actions have also included the deletion of webpages and resources that included information regarding research on women's health conducted or supported by the national research institutes and the deletion of webpages and resources providing information on research and prevention activities of national research institutes that relate to research on women's health. These actions were not in accordance with the law and were in excess of Defendant Bhattacharya's statutory authority.

112.    NIH's deletion of published manuscripts from PubMed Central and deletion of public health webpages and resources related to research on women's health conducted or supported by the national research institutes must therefore be set aside pursuant to the APA.

---

[62] *See PubMed Central*, Nat'l Libr. of Med., https://pmc.ncbi.nlm.nih.gov (last visited May 19, 2025).

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### NINTH CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act and Prematurity Research Expansion and Education for Mothers Who Deliver Infants Early Act**
**(On Behalf of All Plaintiffs Against Defendants Kennedy and CDC Director)**

113.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

114.    The Prematurity Research Expansion and Education for Mothers Who Deliver Infants Early Act imposes a legal duty on HHS, acting through the CDC Director, to "continue systems for the collection of maternal-infant clinical and biomedical information . . . to link with the Pregnancy Risk Assessment Monitoring System (PRAMS) and other epidemiological studies of prematurity in order to track, to the extent practicable, all pregnancy outcomes and prevent preterm birth." 42 U.S.C. § 247b-4f(c)(1).

115.    Defendants' actions to implement the Gender Ideology EO, DEI EO, and Ezell Memo deleted the webpages for PRAMS and other epidemiological studies of prematurity, thereby denying public health organizations and practitioners the ability to track pregnancy outcomes and prevent preterm birth. These actions were not in accordance with the law and were in excess of Defendants' statutory authority.

116.    Defendants' deletion of public health webpages and resources related to PRAMS and other epidemiological studies of prematurity must therefore be set aside pursuant to the APA.

### TENTH CLAIM FOR RELIEF
**Violation of the Separation of Powers**
**(On Behalf of All Plaintiffs Against All Defendants)**

117.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

118.    "The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983). The President's "authority to act necessarily stems either

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    from an act of Congress or from the Constitution itself." *Trump v. United States*, 603 U.S. 593,

2    607 (2024). "There is no provision in the Constitution that authorizes the President to enact, to

3    amend, or to repeal statutes." *Clinton*, 524 U.S. at 438.

4        119.    The President may not confer powers upon other federal officers or departments

5    within the executive branch—and those officers and departments cannot assume powers—that the

6    President does not himself possess. *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322,

7    1330–32 (D.C. Cir. 1996).

8        120.    Defendants' actions to implement the Gender Ideology EO, DEI EO, and Ezell

9    Memo, including the disregard of statutes mandating the public dissemination of public health

10   information, violate the constitutional principle of the separation of powers.

11                              **PRAYER FOR RELIEF**

12       WHEREFORE, Plaintiffs pray that the Court:

13   A.    Issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that

14         Defendants' deletion of public health webpages and resources is unlawful and

15         invalid for the reasons set forth above;

16   B.    Issue a preliminary injunction and/or permanent injunction enjoining Defendants,

17         including their officials, agents, employees, assigns, and all persons acting in

18         concert or participating with them, from deleting any additional public health

19         webpages and resources in violation of their statutory duties;

20   C.    Issue a preliminary injunction and/or permanent injunction requiring Defendants,

21         including their officials, agents, employees, assigns, and all persons acting in

22         concert or participating with them, to restore the public health webpages and

23         resources that have been deleted and to maintain their web domains in accordance

24         with their statutory duties;

25

26

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    D.    Order Defendants to file a status report with the Court within twenty-four hours of

2          entry of a preliminary injunction, and at regular intervals thereafter, confirming

3          compliance with these orders;

4    E.    Award Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant

5          to any applicable law; and

6    F.    Issue such other and further relief as the Court deems equitable, just, and proper.

7

Dated: July 25, 2025                    By: *s/ Kevin J. Hamilton*
8                                            Kevin J. Hamilton, WSBA No. 15648
                                        By: *s/ Heath L. Hyatt*
9                                            Heath L. Hyatt, WSBA No. 54141
                                        By: *s/ Jonathan P. Hawley*
10                                           Jonathan P. Hawley, WSBA No. 56297
                                        By: *s/ Raul P. Quintana*
11                                           Raul P. Quintana, WSBA No. 62859
                                        **PERKINS COIE LLP**
12                                       1301 Second Avenue, Suite 4200
                                        Seattle, Washington 98101
13                                       Telephone: (206) 359-8000
                                        Facsimile: (206) 359-9000
14                                       KHamilton@perkinscoie.com
                                        HHyatt@perkinscoie.com
15                                       JHawley@perkinscoie.com
                                        RQuintana@perkinscoie.com
16

17                                       Mikael I. Floyd*
                                         **PERKINS COIE LLP**
18                                       700 Thirteenth Street NW, Suite 800
                                         Washington, D.C. 20005
19                                       Telephone: (202) 654-6200
                                         Facsimile: (202) 654-6211
20                                       MFloyd@perkinscoie.com

21                                       *Counsel for Plaintiffs*

22                                       *Admitted pro hac vice*

23

24

25

26

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 38
(No. 2:25-cv-00955-LK)

1

## **APPENDIX A**

2

The following chart lists federal public health resources that have been deleted or otherwise

3

affected by Defendants' actions challenged in this lawsuit.

4

Rows highlighted in green reflect resources that are currently being litigated in *Doctors for*

5

*America v. OPM*, No. 25-322 (JDB) (D.D.C.), *see supra* note 2.

6

| Affected Resource | Description | Status as of July 25, 2025 |
|---|---|---|
| 2023 Adolescent LGB+ Behavioral Health Report | Provides key behavioral health indicators by sexual identity among adolescents aged 12 to 17 in the United States | Restored with disclaimer |
| Advancing Better Health Through Better Understanding for Black and African American Communities: Health Literacy, Health Care Access, and Culturally Appropriate Care 2024 Reading List | Presents resources on health disparities and the impact of health literacy and culturally appropriate care on improving health outcomes for the Black and African American communities | Offline |
| Advancing Clinical Trial Participation for the LGBTQIA+ Community | Examines barriers to clinical trial participation experienced by the LGBTQIA+ community | Offline |
| CDC Efforts to Address Racism in Public Health | Details CDC's public health partnerships aimed at addressing racism as a driver of health disparities | Offline |
| CDRH 2022-2025 Strategic Priorities | Outlines the strategic goals of the Center for Devices and Radiological Health ("CDRH") for promoting and protecting public health in the upcoming year | Offline |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

| Affected Resource | Description | Status as of July 25, 2025 |
|---|---|---|
| CDRH Health of Women Strategic Plan | Outlines the three CDRH Health of Women Program priorities—sex- and gender-specific analysis and reporting, an integrated approach for current and emerging issues, and a research roadmap—to protect and promote women's health | Offline |
| Creating Safer Spaces in Schools for LGBTQ Youth | Provides resources to support LGBTQ youth facing harassment, discrimination, or other social challenges | Offline |
| Diabetes and the LGBTQ Community | Highlights higher diabetes prevalence within the LGBTQ+ community and underscores the importance of targeted health interventions | Offline |
| Diversity Action Plans to Improve Enrollment of Participants from Underrepresented Populations in Clinical Studies | Provides draft guidance outlining the required form, content, and submission process for diversity action plans to support inclusive health initiatives | Restored with disclaimer |
| Diversity Matters | Presents information on groups underrepresented in the biomedical, clinical, behavioral, and social sciences to inform equitable research and policy development | Offline |
| Diversity Matters, Underrepresented Groups | Examines the lack of diversity in the biomedical workforce and its impact on the effectiveness of healthcare delivery | Offline |

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

| Affected Resource | Description | Status as of July 25, 2025 |
|---|---|---|
| Ending the HIV Epidemic in the US Partner and Grantee Resources | Provides information, tools, and resources to support the implementation of high-impact HIV prevention strategies in communities nationwide | Restored with disclaimer |
| Evaluation of Sex-Specific and Gender-Specific Data in Medical Device Clinical Studies | Offers guidance for industry and FDA staff to consider gender and sex in evaluating the safety and effectiveness of medical devices | Restored with alterations |
| Facts about LGBT Youth Suicide | Explains that LGBTQ youth face higher suicide risk due to mistreatment and societal stigma | Offline |
| Gender and Health: Impacts of Structural Sexism, Gender Norms, Relational Power Dynamics, and Gender Inequities | Provides a compilation of resources and research on the impacts of structural sexism, gender norms, relational power dynamics, and gender inequities in the healthcare context | Offline |
| Guidance for Improving Staff Engagement: Integrating Diversity, Equity and Inclusion in SOAR Work | Offers guidance for improving staff engagement by integrating diversity, equity, and inclusion in SSI/SSDI Outreach, Access, and Recovery work, with a focus on addressing barriers related to racism and inequity | Offline |
| Helping a Transgender Youth Find Safety and Belonging | Presents a course for mental health professionals featuring a video of a therapeutic session with a transgender youth discussing challenges related to COVID-19 and related health measures, followed by expert commentary | Offline |
| HIV Risk Reduction Tool | Provides a tool to reduce the risk of HIV exposure | Offline |
| HHS LGBTQI+ Health and Wellbeing Website | Provides a comprehensive collection of resources on LGBTQI+ health and wellbeing | Offline |

FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 41
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

| Affected Resource | Description | Status as of July 25, 2025 |
|---|---|---|
| iText | Provides resources related to iText, a mobile health intervention designed to improve individual-level PrEP adherence | Offline |
| LGBT (Lesbian, Gay, Bisexual & Transgender) Needs & Disaster | Highlights the critical role of religious leaders in ensuring LGBT disaster survivors receive culturally appropriate assistance and services | Offline |
| LGBTQ+ People Encounter Barriers to Quitting Tobacco Successfully | Examines barriers faced by the LGBTQ+ community in quitting tobacco use | Offline |
| Making Shelters Safe for Transgender Evacuees | Provides guidelines for evacuation shelters to ensure safety and respect for transgender individuals, including affirming self-identification and addressing inappropriate behavior or harassment | Offline |
| Medical Monitoring Project (MMP) | Collects and reports data on behaviors, clinical outcomes, quality of care, and barriers to care and viral suppression among people diagnosed with HIV in the United States | Restored with disclaimer |
| Mpox FAQs | Offers answers to frequently asked questions about the Mpox vaccine | Offline |
| National Institutes of Health Sexual & Gender Minority Research Office | Provides information about the Sexual & Gender Minority Research Office, including access to annual reports, resources, and data | Offline |

FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 42
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

| Affected Resource | Description | Status as of July 25, 2025 |
|---|---|---|
| NCHHSTP Workforce: Diversity | Presents National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention workforce demographic trends from 2014 to 2024 and describes how these metrics have informed recruitment, screening, interviewing, and internal policies to enhance diversity and prevent discrimination | Offline |
| PEPFAR Data Dashboards | Collects and disseminates data on the U.S. President's Emergency Plan for AIDS Relief | Offline with notice |
| Pregnancy Risk Assessment Monitoring System (PRAMS) | Monitors maternal and infant health through ongoing, site-specific, population-based surveillance to identify high-risk groups, track health status changes, and measure progress toward improving maternal and infant health outcomes | Restored with disclaimer |
| Prior Years' LGBT Reports | Coordinates LGBT-related policies across HHS through a committee of senior representatives and recommends future departmental actions | Offline |
| Public Engagement, Vulnerable Communities, and Health Equity | Describes the NIH Climate Change and Health Initiative's funding of four ACE-CH sites to advance sustainable strategies addressing climate change impacts on vulnerable communities, with an emphasis on health equity | Offline |
| Report on Health Disparities Related to Commercial Tobacco Use that Affect LGBTQ+ People | Reports on health disparities in commercial tobacco use affecting LGBTQ+ populations | Offline |

FIRST SUPPL. COMPL. FOR DECLARATORY & INJUNCTIVE RELIEF – 43
(No. 2:25-cv-00955-LK)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

| Affected Resource | Description | Status as of July 25, 2025 |
|---|---|---|
| Reproductive Rights Website | Provides comprehensive information and resources on reproductive health care | Offline |
| Resources for LGBTQ Youth Experiencing Homelessness | Provides a toolkit with resources and guidance related to youth homelessness within the LBGTQ community | Offline |
| Ryan White HIV/AIDS Program Compass Dashboard | Enables users to interact with and visualize data on the reach, impact, and outcomes of the Ryan White HIV/AIDS Program | Offline |
| SACHRP Recommendations for the Ethical Review and Inclusion of LGBTQI+ Participants in Human Subjects Research | Presents an ethical review by the HHS Advisory Committee on Human Research Protections on the inclusion of LGBTQI+ participants in human-subject research | Offline |
| Social Vulnerability Index | Identifies the communities most vulnerable to disasters and public health emergencies | Restored with disclaimer |
| Study of Sex Differences in the Clinical Evaluation of Medical Products | Examines sex differences in the development and evaluation of medical products | Restored with disclaimer |
| Supporting Care for Women with Opioid Use Disorder | Offers a toolkit for healthcare providers on best practices for treating women with opioid addictions | Offline |
| Supporting LGBTQ+ Youth | Provides resources to support the health and well-being of LGBTQ+ youth | Restored with disclaimer |
| Surgeon General's Advisory on Firearm Violence | Provides resources on preventing firearm deaths among children | Offline |

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000

| Affected Resource | Description | Status as of July 25, 2025 |
|---|---|---|
| Top Health Issues for LGBT Populations Information & Resource Kit | Offers an information and resource kit outlining top health issues for LGBT populations | Offline |
| Transgender Behavioral Health Disparities | Provides a fact sheet on transgender mental health and substance use | Offline |
| Youth Risk Behavior Surveillance System (YRBSS) | Tracks health behaviors of U.S. high school students, identifies emerging issues, and evaluates programs to support youth health | Restored with disclaimer |

FIRST SUPPL. COMPL. FOR DECLARATORY &
INJUNCTIVE RELIEF – 45
(No. 2:25-cv-00955-LK)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Phone: +1.206.359.8000
Fax: +1.206.359.9000